IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| GREGORY J. M., | CV 19-07-M-KLD |
| Plaintiff, | |
| vs. | ORDER |
| ANDREW M. SAUL, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking judicial review of a partially favorable decision by the Commissioner of Social Security on his applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq.

I.      **Procedural Background**

Plaintiff protectively filed an application for Title II disability insurance benefits in April 2014, alleging disability since July 6, 2006. (Doc. 4, at 192).

Plaintiff later amended his onset date to May 7, 2009 (doc. 4, at 50), and he was last insured for Title II disability benefits on September 30, 2011. (Doc. 4, at 1013). Plaintiff's claim was denied initially and on reconsideration, and by an ALJ after an administrative hearing. (Doc. 4, at 145-47). The Appeals Council denied Plaintiff's request for review of the ALJ's decision, and Plaintiff appealed. (Doc. 4, at 8-12). On November 9, 2017, this Court reversed the Commissioner's final decision and remanded the matter for further administrative proceedings. (Doc. 4, at 1149-1166).

In the meantime, on November 7, 2016, Plaintiff filed an application for Title XVI supplemental security income benefits. (Doc. 4, at 1040). That application was combined with Plaintiff's Title II application, and on September 25, 2018, the ALJ issued a partially favorable decision. (Doc. 4, at 1013-26). For purposes of Plaintiff's application for Title II disability insurance benefits, the ALJ found he was not disabled through September 30, 2011, the date last insured. But with respect to supplemental security income benefits, the ALJ found Plaintiff disabled as of November 7, 2016, the date he filed his Title XVI application.

On January 7, 2019, Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the ALJ's decision to the extent he concluded Plaintiff was not disabled prior to his date last insured and denied his application for Title II

disability insurance benefits.

## II.  <u>Legal Standards</u>

### A.  **Standard of Review**

42 U.S.C. § 405(g) provides a limited waiver of sovereign immunity, allowing for judicial review of social security benefit determinations after a final decision of the Commissioner made after a hearing. *See Treichler v. Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). A court may set aside the Commissioner's decision "only if it is not supported by substantial evidence or is based on legal error." *Treichler*, 775 F.3d at 1098 (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where evidence is susceptible for more than one rational interpretation," the court must uphold the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035,

1038 (9th Cir. 2008) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).

### B. Disability Determination

To qualify for disability benefits under the Social Security Act, a claimant bears the burden of proving that (1) he suffers from a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the claimant incapable of performing past relevant work or any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). *See also Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d 1190, 1193-94 (9th Cir. 2004).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920. If a claimant is found to be "disabled" or "not disabled" at any step, the ALJ need not proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005). The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

At step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If so, then the claimant is not disabled within the meaning of the Social Security Act.

At step two, the ALJ must determine whether the claimant has any impairments, singly or in combination, that qualify as severe under the regulations. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will proceed to step three.

At step three the ALJ compares the claimant's impairments to the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii). If the ALJ finds at step three that the claimant's impairments meet or equal the criteria of a listed impairment, then the claimant is considered disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii).

If the ALJ proceeds beyond step three, he must assess the claimant's residual functional capacity. The claimant's residual functional capacity is an assessment of the work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Social Security Ruling (SSR) 96-8p. The assessment of a claimant's

residual functional capacity is a critical part of steps four and five of the sequential evaluation process.

At step four, the ALJ considers whether the claimant retains the residual functional capacity to perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(4)(v). The ALJ may satisfy this burden through the testimony of a vocational expert or by referring to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2. If the ALJ meets this burden, the claimant is not disabled.

## III.  <u>Discussion</u>

The ALJ followed the five-step sequential evaluation process in evaluating Plaintiff's claim. At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2011. The ALJ further found that Plaintiff had engaged in substantial gainful activity after the original alleged onset date of July 7, 2006. As the ALJ noted, however, Plaintiff

had amended his onset date to May 7, 2009, to coincide with the date he stopped working. (Doc. 4, at 1015-16).

At step two, the ALJ found that since the May 7, 2009 amended alleged onset date, Plaintiff has had the following severe impairments: major depressive disorder, personality disorder, post-traumatic stress disorder (PTSD), and ventricular tachycardia. (Doc. 4, at 1016). At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that met or medically equaled any impairment described in the Listing of Impairments, 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. pt. 404, subpt. P, app. 1. (Doc. 4, at 1016-17).

At steps four and five, the ALJ made two different residual functional capacity assessments. For purposes of Plaintiff's application for Title II disability insurance benefits, the ALJ focused on Plaintiff's residual functional capacity for the period between his amended alleged onset date of May 7, 2009 and the expiration of his insured status on September 30, 2011.[1] The ALJ found that

_____

[1] A claimant seeking Title II disability insurance benefits must show that he became disabled before his date last insured. 42 U.S.C. § 416(1)(3); 20 C.F.R. § 404.1010. *See also Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1460 (9th Cir. 1995) (The statutory scheme "requires that a disability be continuously disabling from the time of onset during insured status to the time of application for benefits, if an individual applies for benefits for a current disability after the expiration of insured status).

Plaintiff's statements as to the severity of his symptoms during this period were not fully supported, and determined that he had the residual functional capacity to perform a reduced range of light work. (Doc. 4, at 1017-18). The ALJ's residual functional capacity assessment included several exertional and non-exertional limitations. Relevant here, the ALJ incorporated the following non-exertional limitations:

> He could tolerate brief and superficial contact with one member of the public on an occasional basis. He could tolerate occasional contact with coworkers at a work site with six or fewer workers, or with separate cubicles. He could understand, carry out, and remember simple tasks and instructions provided work did not require constant focus or stress. He could tolerate occasional new learning of simple work tasks.

> (Doc. 4, at 1017).

Based on this residual functional capacity, the ALJ found at step four that Plaintiff could not perform his past relevant work as a custodian and salesperson. (Doc. 4, 1024). Proceeding to step five, the ALJ found based on the vocational expert's testimony that there were other jobs existing in significant numbers in the national economy that Plaintiff could have performed. (Doc. 4, at 1024-1025). Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time prior to the expiration of his insured status on September 30, 2011.

For purposes of Plaintiff application for Title XVI supplemental security income benefits, however, the ALJ assessed Plaintiff's residual functional capacity

beginning on November 7, 2016, the date of his application.[2]  The ALJ observed that Plaintiff's psychological symptoms had gotten worse after the date last insured and found that his allegations regarding his symptoms and limitations during this period were consistent with the evidence. As a result, the ALJ found that beginning on November 7, 2016, Plaintiff's residual functional capacity for light work was subject to two additional non-exertional limitations: "He is expected to be off task more than 15% of the workday and will miss work more than two days per month." (Doc. 4, at 1023). Based on this residual functional capacity, the ALJ again found at step four that Plaintiff could not perform any past relevant work. (Doc. 4, 1024). Proceeding to step five, the ALJ found based on the vocational expert's testimony there are no jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Doc. 4, at 1025). Thus, the ALJ found Plaintiff was disabled and entitled to Title XVI disability benefits beginning on November 7, 2016. (Doc. 4, at 1026).

Plaintiff does not challenge this portion of the ALJ's decision. To the extent the ALJ found Plaintiff was not disabled at any time through the date he was last insured for Title II disability benefits, however, Plaintiff argues the ALJ's decision

---

[2] Because supplemental security income benefits are not retroactive, the relevant period begins on the date the application is filed.

is not supported by substantial evidence and raises four issues on appeal.[3]

First, Plaintiff maintains the ALJ erred by not giving more weight to medical opinion evidence provided by treating psychologist Dr. Julie Hergenrather and treating psychiatrist Dr. John Willoughby. Second, Plaintiff argues the ALJ failed to give germane reasons for discounting the opinion of his mental health counselor, Greg Shanks. Third, Plaintiff maintains the ALJ did not provide sufficiently clear and convincing reasons for discrediting his subjective symptom testimony. Finally, Plaintiff argues the ALJ erred by relying on vocational expert testimony elicited in response to an incomplete hypothetical question. The Court addresses each argument in turn.

### A.    Medical Opinion Evidence

As stated above, the relevant period for purposes of Plaintiff's application for Title II disability insurance benefits began on May 7, 2009 alleged onset date and ended with the expiration of his insured status on September 30, 2011. The administrative record contains several medical opinions and records that are

---

[3] In his reply brief, Plaintiff argues his statement of facts should be taken as true and asks the Court to remand for an award of benefits because the Commissioner has violated his Constitutional right to due process by not providing a statement of facts relevant to the issues submitted for review as required by Local Rule 78.2(b). (Doc. 9, at 1-4). The Commissioner's brief complies with the substantive requirements of Local Rule 78.2(b). Thus, the Court will address the issues presented on the merits.

relevant to Plaintiff's physical and mental functioning during this period. Plaintiff does not challenge the ALJ's evaluation of the medical source opinions addressing his physical abilities and limitations. Instead, he argues the ALJ erred in evaluating the medical source opinions that are relevant to his mental functioning prior to September 30, 2011.

When evaluating a disability claim, an ALJ may rely on medical "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 2995). Generally, the opinion of a treating physician is entitled to the greatest weight. *Lester*, 81 F.3d at 830. "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician." *Lester*, 81 F.3d at 830.

Where there are conflicting medical opinions in the record, the ALJ is responsible for resolving that conflict. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, it is entitled to controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir 2007). If a treating physician's

opinion is not entitled to controlling weight, the ALJ considers several factors in determining what weight it will be given. *Orn*, 495 F.3d at 631. Those factors include the "[l]ength of the treatment relationship and the frequency of the examination" and the "[n]ature and extent of the treatment relationship." *Orn*, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(c)(2)(i)-(ii)). Additional factors relevant to the ALJ's evaluation of any medical opinion, not limited to that of a treating physician, include: (1) the supportability of the opinion; (2) the consistency of the opinion with the record as a whole; (3) the specialization of the treating or examining source; and (4) any other factors that are brought to the ALJ's attention that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

To discount the uncontroverted opinion of a treating or examining physician, the ALJ must provide clear and convincing reasons for doing so and those reasons must be supported by substantial evidence. *Lester,* 81 F.3d at 830 (9th Cir. 1995). To discount the controverted opinion of a treating or examining physician, the ALJ must provide specific and legitimate reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. The ALJ may accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

As set forth below, the administrative record in this case contains conflicting opinions from treating and non-examining mental health sources regarding Plaintiff's functioning during the relevant period. Given these conflicting opinions, the ALJ was required to give specific and legitimate reasons for discrediting one opinion in favor of another.

### 1. Dr. Julie Hergenrather

Pursuant to this Court's remand order, the Appeals Council directed the ALJ to further address the opinion of Plaintiff's treating psychologist, Dr. Julie Hergenrather. Plaintiff argues the ALJ erred on remand by not giving more weight to Dr. Hergenrather's opinion. Dr. Hergenrather began treating Plaintiff for PTSD in September 2006, after he was involved in a work-related motor vehicle accident. Dr. Hergenrather continued to treat Plaintiff until October 2010. (Doc. 4, 813-61). In September 2009, Dr. Hergenrather completed a Physician Statement for Work Site Accommodation form. (Doc. 4, at 958-61). Plaintiff had been working as a custodian at the University of Montana and asked his employer to implement reasonable accommodations for his PTSD so that he would be able to perform the essential functions of his job.

Plaintiff's employer expected him to "build and maintain a work atmosphere of trust and respect by establishing open communication with co-workers," refrain

from outbursts, "take steps to prevent destructive conflict and handle conflict in an appropriate manner," and not spy or eavesdrop on his co-workers. (Doc. 4, at 961). Dr. Hergenrather wrote that Plaintiff would not be able to comply with those work expectations at that time because of the symptoms associated with his PTSD. (Doc. 4, at 961). Dr. Hergenrather indicated there were no accommodations for Plaintiff's PTSD that would effectively enable him to perform his job duties at that time and wrote that he had a full medical restriction from work duties for one year – from September 2009 to September 2010 – to undergo treatment for his PTSD. Dr. Hergenrather explained that Plaintiff was engaging in weekly cognitive behavior therapy for his PTSD and anticipated that his condition would improve over time. (Doc. 46, at 956-61).

Plaintiff's argument with respect to Dr. Hergenrather's opinion is twofold. First, Plaintiff maintains the ALJ failed to provide legally sufficient reasons for discounting Dr. Hergenrather's opinion as to the severity of his PTSD. He claims Dr. Hergenrather's opinion unequivocally establishes that he was disabled from his May 2009 alleged onset date to September 2010. Second, Plaintiff argues that with a period of disability thus established, the ALJ should have applied the medical improvement standard used in continuing disability reviews and closed period cases to find him disabled through the date of his decision.

a.     *Specific and Legitimate Reasons*

With respect to Plaintiff's first argument, the ALJ considered Dr. Hergenrather's opinion and gave it "some weight." (Doc. 4, at 1022). In doing so, the ALJ found it significant that Dr. Hergenrather "only considered whether [Plaintiff] could perform his past relevant work as a custodian, and not other work available within the residual functional capacity." (Doc. 4, at 1022). Consistent with Dr. Hergenrather's opinion, the ALJ found that Plaintiff was not capable of performing past relevant work as a custodian because the job "requires exertional and non-exertional capabilities in excess of his residual functional capacity." (Doc. 4, at 1024). Also consistent with Dr. Hergenrather's opinion, the ALJ included several non-exertional restrictions in Plaintiff's residual functional capacity, such as limiting him to "brief and superficial contact with one member of the public on an occasional basis" and "occasional contact with coworkers at a work site with six or fewer workers, or with separate cubicles" (Doc. 4, at 1017). As the ALJ's decision thus reflects, he gave some weight to Dr. Hergenrather's opinion to the extent she indicated that Plaintiff was not capable of returning to work as a custodian due to his PTSD.

To the extent Dr. Hergenrather's opinion can be read as indicating that Plaintiff's depression and PTSD-related symptoms were of such disabling severity

that he would have been precluded from engaging in all substantial gainful activity between September 2009 and September 2010, the ALJ provided specific and legitimate reasons for discounting that assessment.

First, the ALJ noted that Dr. Hergenrather's opinion was inconsistent with the medical records, which showed that Plaintiff quickly reported improvement in his symptoms with medication prescribed by his treating psychiatrist, Dr. John Willoughby, and mindfulness treatment with his mental health counselor, Greg Shanks. (Doc. 4, at 1022). Plaintiff began seeing Dr. Willoughby in December 2009, and by January 2010 reported that his mood and energy were improved after having been prescribed new medication. (Doc. 4, at 645). When Plaintiff saw Dr. Willoughby again in July 2010, he felt he was doing better on medication but stated that anger control issues were still a problem. (Doc. 4, at 643). Dr. Willoughby adjusted Plaintiff's medications to address his anger control issued and in August 2011 Plaintiff stated that he was doing "very well" and had not had any anger outbursts at all in the last month. (Doc.4, at 636). During much of this period Plaintiff was also seeing licensed clinical professional counsel Greg Shanks for meditation and mindfulness training. (Doc. 4, at 325-478). Overall, those records reflect that Plaintiff benefited from treatment with Mr. Shanks and was better able to manage his PTSD symptoms. In May 2011, Mr. Shanks observed that Plaintiff's

"PTSD symptoms have reduced considerably" and at a June 2011 visit he said "it looks like we have completed our work on [Plaintiff's] PTSD." (Doc. 4, at 386-87).

Dr. Hergenrather's records similarly demonstrate that Plaintiff's symptoms improved during the course of their treatment relationship, which ended in October 2010. (Doc. 4, 813-861). In August 2010, Dr. Hergenrather explained that while Plaintiff continued to experience PTSD-related symptoms, meditation and exposure had improved his status greatly and treatment should be focused on increasing his activity level and meaningful social interaction. (Doc. 4, at 816). The ALJ permissibly gave Dr. Hergenrather's September 2009 opinion little weight in part because it was not consistent with the medical records, which reflected that Plaintiff's symptoms improved with treatment. See *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (holding that the ALJ reasonably discounted a treating physician's opinion because the medical records did not support the limitations set forth in the opinion); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d at 692-93 (9th Cir. 2009) (upholding the ALJ's rejection of treating psychologist's opinion because it conflicted with the psychologist's treatment notes). This reason alone amounts to a specific and legitimate basis for discounting Dr. Hergenrather's opinion.

Second, the ALJ gave Dr. Hergenrather's opinion as to Plaintiff's PTSD-related limitations little weight because she did not provide any supporting examples. (Doc. 4, at 1022). Dr. Hergenrather wrote that Plaintiff would not be able to comply with his employer's work expectations because "feelings of detachment from others, difficulty establishing and maintaining trust in relationships, irritability and anger outbursts, restricted range of affect, difficulty concentrating and hypervigilance are core symptoms" of PTSD. (Doc. 4, at 961). Dr. Hergenrather did not explain how or to what degree Plaintiff experienced these core symptoms, however, and said nothing about whether Plaintiff's symptoms would prevent him from complying with work expectations at some other job. The ALJ accommodated for Plaintiff's PTSD-related symptoms in the residual functional capacity assessment and reasonably discounted Dr. Hergenrther's opinion in part because it did not contain any supporting explanation. See *Batson v. Comm'r of Soc. Sec. Admin.* 359 F.3d 1190, 1195 (9th Cir. 2004) (explaining that an ALJ need not accept a treating physician's opinion "it that opinion is brief, conclusory, and inadequately supported by clinical findings"). Thus, to the extent the ALJ discounted Dr. Hergenrather's opinion, the Court concludes the ALJ provided sufficiently specific and legitimate reasons for doing so.

b.    *Medical Improvement Standard*

Because the ALJ permissibly discounted Dr. Hergenrather's opinion, Plaintiff's argument that the ALJ should have applied the medical improvement standard used in continuing disability reviews and closed period cases necessarily fails as well. Plaintiff's argument begins with the premise that Dr. Hergenrather's opinion is entitled to controlling weight and establishes that he was disabled from his May 2009 alleged onset date to September 2010. With disability for that closed period thus established, Plaintiff argues the ALJ should have applied the medical improvement standard to find him disabled through the date of his decision on September 25, 2018.

Once a claimant has been found disabled, "a presumption of continuing disability arises" and the Commissioner bears the burden of producing evidence sufficient to rebut the presumption of continuing disability." *Bellamy v. Secretary of Health & Human Serv.*, 755 F.2d 1380, 1381 (9th Cir. 1985). Before limiting disability to a closed period, the ALJ must follow an eight-step evaluation process to determine whether the claimant experienced medical improvement following the disability onset date. See *Attmore v. Colvin*, 827 F.3d 872, 875-76 (9th Cir. 2016). As discussed above, the ALJ provided specific and legitimate reasons for discounting Dr. Hergenrather's opinion. This means that a presumption of continuing disability never arose in this case, and the eight-step medical

improvement standard is simply inapplicable.

  2. <u>Dr. John Willoughby</u>

  Plaintiff argues generally that the ALJ erred by not giving more weight to treating psychiatrist Dr. John Willoughby's treatment notes and statements he made describing Plaintiff's anger control problems. For example, Plaintiff points out that in July 2010, Dr. Willoughby noted Plaintiff was doing better with anger control on his medications but anger was "still definitely a problem." (Doc. 4, at 643-44). And in May 2011, Dr. Willoughby questioned whether Plaintiff's "anger issue" was more related to a traumatic brain injury than PTSD. (Doc. 5, at 633-34). Notably, however, Plaintiff does not identify any specific medical opinion from Dr. Willloughby that he believes the ALJ failed to properly credit.

  Treatment notes, in general do not constitute medical opinions. See 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, and what you can still do despite impairment(s),and your physical or mental restrictions."). A treatment note that does not state a medical opinion is not subject to the same scrutiny applied to a medical opinion. See *Modesitt v. Astrue*, 2010 WL 3749290, *8 (C.C. Cal. Sept. 21, 2010). Therefore, Dr. Willoughby's treatment notes are not medical opinions

the ALJ was required to specifically weigh or discount. See *Turner v. Comm's of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear and convincing reasons' for rejecting [the] report because the ALJ did not reject any of [the report's] conclusions.").

The ALJ discussed Dr. Willoughby's treatment notes in his decision, including those mentioning Plaintiff's anger control issues, and was not required to provide specific reasons for discounting them. The ALJ also discussed the fact that Dr. Willoughby consistently assigned Plaintiff GAF scores of 55, which are indicative of moderate symptoms. (Doc. 4, at 1022). To the extent those GAF scores constitute medical opinions, the ALJ permissibly gave them little weight because they "are only snapshots of a claimant's functioning and consider non-psychological factors such as employment and housing status." (Doc. 4, at 1022). The ALJ reasonably found that on the whole, Dr. Willoughby's treatment notes showed that "with adherence to a medication regiment and treatment, [Plaintiff's] symptoms appeared stable and controlled as of the date last insured." (Doc. 4, at 1020).

3.    Non-Examining Physicians

Clinical psychologist Dr. Michael Enright testified as a psychological expert at the hearing on remand in September 2018. (Doc. 4, at 1046-62). Dr. Enright reviewed the medical records for the period from May 2009 until September 2011 and testified as to Plaintiff's mental functioning and limitations during that time. Dr. Enright testified that Plaintiff had mild limitations in understanding, remember and carrying out tasks, moderate to sometimes marked limitations in social interaction, moderate limitations in concentration, persistence or pace, and moderate limitations in adapting and managing. (Doc. 4, at 1049-1050). The ALJ gave Dr. Enright's testimony great weight and properly accounted for these limitations in the residual functional capacity assessment by including several interpersonal and cognitive limitations. See *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.").

The state agency psychological consultants, Dr. Marsha McFarland and Dr. Robert Bateen, identified similar limitations based on their review of the medical records for the period prior to September 2011. (Doc. 4, at 123-33; 135-44). They further stated that Plaintiff should not be expected to work in a setting requiring close or frequent interaction with others, should have limited contact with coworkers and the general public, and should not need to respond to frequent

changes in a work setting. (Doc. 4, at 123-33; 135-44). The ALJ gave these opinions some weight as well, and accounted for these limitations in the residual functional capacity assessment.

These non-examining medical source opinions are supported by and consistent with other evidence in the record and constitute substantial evidence in support of the ALJ's finding that Plaintiff was not disabled at any time through September 30, 2011, the date last insured. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.")

### B.     Other Source Opinions

Pursuant to this Court's remand order, the Appeals Council directed the ALJ to address the opinion of Plaintiff's treating therapist, Greg Shanks. Plaintiff argues the ALJ erred on remand by not giving that opinion more weight.

Mr. Shanks is a licensed clinical professional counselor who saw Plaintiff roughly once every week or two from February 2010 through his date last insured. (Doc. 4, at 325-478). In October 2015, Mr. Shanks wrote a letter addressing Plaintiff's symptoms and limitations both at the time of the letter's writing and

during the relevant period prior to September 2011. (Doc. 4, at 997-1004). Mr. Shanks provided a detailed assessment of Plaintiff's functioning prior to September 2011 and concluded that his mental health difficulties would have prevented him from maintaining full-time employment, even of a low stress and routine nature, without any special employer accommodations on a consistent and reliable basis." (Doc. 4, at 1004).

As a licensed clinical professional counselor, Mr. Shanks is considered an "other medical source" rather than an "acceptable medical source." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). When an "other source" medical provider works closely with and under the supervision of an acceptable medical source, the other source opinion may be considered that of an acceptable medical source. See *Taylor v. Comm'r*, 659 F.3d 1228, 1234 (9th Cir. 2011) (citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996)). While Dr. Hergenarather signed several of Mr. Shanks' treatment notes, the record does not establish that Mr. Shanks was working under her close supervision. In addition, Dr. Hergenrather did not sign Mr. Shanks' October 2015 letter and there is nothing to suggest that she otherwise endorsed it. Thus, Mr. Shanks is considered an "other source". Other sources are not qualified to give medical opinions but can provide evidence about the severity of a claimant's impairments and how they affect the claimant's ability

24

to work. See 20 C.F.R. §§ 404.1513, 416.913.  While an ALJ must provide specific and legitimate reasons based on substantial evidence for rejecting a controverted opinion from an "acceptable medical source," an "other source" opinion is not entitled to the same deference and may be discounted if the ALJ provides germane reasons for doing so. *Molina*, 674 F.3d at 1111-12.

The ALJ provided a detailed summary of Mr. Shanks' treatment notes and specifically addressed his October 2015 letter. (Doc. 4, at 1020-21). For example, the ALJ discussed treatment notes showing that Plaintiff benefited from meditation and mindfulness training, was better able to focus on various daily tasks, and was better organized. (Doc. 4, at 326). The ALJ also cited treatment notes from January 2011 showing that Plaintiff reported a positive impact from EMDR treatment. (Doc. 4, at 367). While Plaintiff continued to experience some anger outbursts and other symptoms during this period, at a March 2011 session Mr. Shanks noted that he "had a great week with real improvements in functioning". (Doc. 4, at 378). And by May and June 2011, Mr. Shanks stated that Plaintiff's "PTSD symptoms have reduced considerably" and "it looks like we have completed our work on [Plaintiff's] PTSD." (Doc. 4, at 386-87). The ALJ reasonably found that Mr. Shanks' October 2015 opinion was not supported by his contemporaneous treatment notes, which by and large reflected that Plaintiff's PTSD and depressive

symptoms were well controlled and would not have prevented work within his residual functional capacity. (Doc. 4, at 1021). This was a germane reason for giving Dr. Shanks' opinion little weight. See *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (recognizing that a conflict with treatment notes is a germane reason for discounting the opinion of an "other source").

On August 3, 2018, approximately one month before hearing on remand, Mr. Shanks provided another opinion in which he states that prior to Plaintiff's date last insured, he satisfied the criteria of Listing 12.04 for depressive disorders and Listing 12.15 for trauma and stress related disorders. (Doc. 4, at 1711-1712). The ALJ considered this opinion but rejected it for the same reason, namely, because it was not consistent with Mr. Shanks' treatment notes prior to September 2011. The ALJ also found this opinion unpersuasive because Mr. Shanks indicated that he had only had sporadic contact with Plaintiff over an extended period and did not feel qualified to assess his current functional status. (Doc. 4, at 1021, 1712). The ALJ considered the criteria of the mental disorder listings but found that Plaintiff's mental impairments were not of listing-level severity. This step three finding is not challenged by Plaintiff and is supported by substantial evidence, including Dr. Enright's testimony. The ALJ reasonably discounted Mr.

Shanks' other source opinion to the contrary because it was not sufficiently supported.

### C.     Subjective Symptom Testimony

Plaintiff argues the ALJ did not provide sufficiently clear and convincing reasons for discounting his subjective testimony as to the severity of his symptoms.[4]

The ALJ must follow a two-step process when evaluating a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). At step one, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter*, 504 F.3d at 1036. If the claimant meets this initial burden, at step two the ALJ may discredit the claimant's subjective symptom testimony about the severity of his symptoms "only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036.

---

4 The Commissioner argues Plaintiff has waived this challenge because his brief includes no substantive law, argument, or factual support for his assertion. Contrary to the Commissioner's argument, the Court finds this issue was adequately raised in Plaintiff's brief and therefore not waived. (Doc. 7, at 19, 21, 25, 28).

Here, the ALJ found that Plaintiff met his initial burden because he produced evidence of medically determinable impairments that could reasonably be expected to cause his alleged symptoms. The ALJ then found that Plaintiff's subjective statements concerning the intensity, persistence and limiting effects of his symptoms were not fully supported prior to November 7, 2016, the date he applied for Title XVI benefits. (Doc. 4, at 1018). As discussed above, the relevant period for purposes of Plaintiff's Title II application began in May 2009 and ended with the expiration of his insured status in September 2011.

As the hearing on remand commenced, the ALJ and Plaintiff's counsel both agreed that it was not necessary to redo the testimony provided at the original administrative hearing in November 2015. (Doc. 4 at 1043-44). At that hearing, Plaintiff testified that between 2009 and 2011 he had problems with recurring nightmares and PTSD-related flashbacks (Doc. 4, at 75-76). He testified that he drove frequently during that period, but by the time of the hearing in November 2015 was driving less frequently. (Doc. 4, at 77-78). Plaintiff further testified that about once every three months during that period he was experiencing episodes of syncope causing him to pass out. (Doc. 4, at 79-80).

The ALJ discounted Plaintiff's testimony as to the severity of his symptoms during the relevant period for three reasons. First, he found that Plaintiff's daily

activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Doc. 4, at 31). The ALJ noted that Plaintiff reported no problems with personal care, cares for his chickens and dogs, has his meals delivered, does household chores and gardens, goes shopping, and does not spend much time with others but tries to attend church. (Doc. 4, at 1021). In listing these activities, the ALJ cited a function report form completed by Plaintiff in August 2014 – nearly three years after his date last insured. Even assuming Plaintiff's answers were sufficiently related to the relevant time period, the ALJ did not explain how any of these activities undermined or were inconsistent with Plaintiff's alleged symptoms, which included difficulty concentrating, following instructions, and getting along with others. Absent such an explanation, the ALJ's reliance on daily activities is little more than a boilerplate finding and is not a clear and convincing reason for discounting Plaintiff's subjective symptom testimony.

Although the first reason provided by the ALJ was not clear and convincing, the next two reasons were sufficient to sustain his rejection of Plaintiff's subjective testimony. The ALJ found that Plaintiff had "made inconsistent statements regarding matters relevant to the issue of disability." (Doc. 4, at 1021). In particular, the ALJ noted that Plaintiff alleged disability in part based on PTSD-related flashbacks and on syncopal episodes that he testified caused him to nearly

pass out every three months. The ALJ found these allegations were inconsistent with the fact that Plaintiff admitted to driving frequently from 2009 through 2011, denied ever passing out while driving, and stated that no treatment provider precluded him from driving except for six-month suggestion in 2011. (Doc. 4, at 1021). The ALJ reasonably found that Plaintiff's allegations that of such severe syncopal episodes were not consistent with the fact that except for the suggested six-month period, he continued to drive and his driving privileges were not otherwise restricted.

The ALJ further found the fact that Plantiff's symptoms were generally controlled with medication and treatment undermined his testimony as to the disabling severity of his symptoms. For support, the ALJ cited records from Mr. Shanks and Dr. Willoughby. As discussed above, those records showed that Mergenthaler's PTSD symptoms improved with therapy, and his nightmares and other psychiatric symptoms improved with medication. And as to Plaintiff's cardiac impairments, the ALJ cited an August 2011 report from consultative examiner Dr. Simone Musco who evaluated his syncope. (Doc. 4, at 1022). At that time, Plaintiff continued to have episodes of syncope but said they were diminishing in frequency and his most recent one had been six months earlier. (Doc. 4, at 772-74). The ALJ permissibly found the fact that his cardiac and

psychiatric symptoms were generally controlled with medication and treatment undermined his subjective testimony. *See, e.g., Morgan v. Commissioner of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ permissibly discounted claimant's testimony part based on medical records showing that, contrary to claimant's allegations, his symptoms improved medication).

To the extent the ALJ discounted Plaintiff's subjective testimony, the Court finds that the ALJ provided sufficiently clear and convincing reasons, supported by substantial evidence, for doing so.

### D.    Vocational Expert

Plaintiff argues the ALJ's residual functional capacity finding and the resulting hypothetical question were incomplete, and the vocational expert's testimony consequently had no evidentiary value for purposes of demonstrating that other work existed in significant numbers in the national economy that Plaintiff could perform before his date last insured.

The ALJ found that beginning November 7, 2016, Plaintiff would be off task more than 15% of the time (doc. 4, at 1023) and the vocational expert testified that eliminated all work. (Doc. 4, at 1106). Based on that testimony, the ALJ found Plaintiff disabled as of November 7, 2016. Plaintiff argues the ALJ should have included the same limitation for purposes of the period prior to his date last

insured. As discussed above, however, the ALJ properly weighed the medical evidence and evaluated Plaintiff's subjective testimony for period between his alleged onset date of May 7, 2009 and his date last insured of September 30, 2011.

The ALJ adequately accounted for Plaintiff's mental impairments during the relevant period by incorporating the following nonexertional limitations into the residual functional capacity assessment:

> He could tolerate brief and superficial contact with one member of the public on an occasional basis. He could tolerate occasional contact with coworkers at a work site with six or fewer workers, or with separate cubicles. He could understand, carry out, and remember simple tasks and instructions provided work did not require constant focus or stress. He could tolerate occasional new learning of simple work tasks.

(Doc. 4, at 1017).

For the reasons set forth above, the Court find that the ALJ was not required to include any additional imitations in the residual functional capacity assessment, which was supported by substantial evidence. See *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (the ALJ need not include limitations not supported by substantial evidence). The ALJ permissibly found based on the vocational expert's testimony that Plaintiff was not disabled at step five of the sequential evaluation process.

## IV.    Conclusion

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of prejudicial legal error. Accordingly,

IT IS ORDERED that the Commissioner's decision is affirmed.

DATED this 26th day of August, 2019

_____
Kathleen L. DeSoto
United States Magistrate Judge